# CHARLESTON.

L. L. BENNETT AND J. E. HESTER v. R. S. DAYTON et als.

(No. 5639)

Submitted September 14, 1926. Decided September 28, 1926.

1. SALES—*Buyer Desiring to Breach Executory Contract Has Right to Order Deliveries Stopped, Subject to Seller's Right to Damages.*

   A buyer desiring to breach an executory contract, has the legal right to order deliveries thereunder stopped, subject to the seller's right to be compensated in damages. *Electric Co.* v. *Coal Co.*, 91 W. Va. 347, pt. 4 syl. (p. 201.)

   (Sales, 35 Cyc. p. 256 [Anno].)

2. SAME—*On Buyer's Breach of Executory Contract, Seller Has Duty to Minimize Damages; Where Buyer Notifies Seller to Stop Delivering Goods, Subsequent Shipments Are at Seller's Risk.*

   In case of the breach of an executory contract by the buyer, it is the duty of the seller to minimize the damages. Where the buyer notifies the seller to stop delivering goods contracted for, shipments subsequent thereto are at the risk of the seller. (p. 203.)

   (Sales, 35 Cyc. p. 594 [Anno].)

3. APPEAL AND ERROR—*Just Verdict Should Not be Disturbed Because of Erroneous Instruction.*

   A just verdict should not be disturbed because of an erroneous instruction. *Wiggin* v. *Dillon*, 66 W. Va. 313. (p. 204.)

   (Appeal and Error, 4 C. J. § 3026.)

4. SAME—

   An instruction, excepted to when given, may be reviewed upon a motion to set aside the verdict as *contrary to the law*, even if the motion makes no specific reference to the instruction. (p. 204.)

   (Appeal and Error, 3 C. J. § 863.)

   (NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of Syllabi.)

Error to Circuit Court, Randolph County.

Action by L. L. Bennett and another, as partners, against R. S. Dayton and others to recover damages for breach of

contract. Verdict for plaintiffs was set aside, and a new trial awarded, and plaintiffs bring error.

*Judgment reversed; verdict reinstated,*
*judgment entered here.*

*A. M. Cunningham* and *D. H. Hill Arnold,* for plaintiffs in error.

*H. G. Kump,* and *Poffenbarger, Blue & Dayton,* for defendants in error.

HATCHER, JUDGE:

This action was brought in the circuit court of Randolph County to recover damages for the breach of a contract. A trial was had at the March Term, 1925, resulting in a verdict in favor of plaintiffs for $2531.57. The defendants moved to set aside the verdict as excessive and as contrary to the law and the evidence. The court took the matter under advisement until the October Term, 1925, when the motion of defendants was sustained and a new trial awarded. The case is here on a writ allowed the plaintiffs.

On May 17, 1921, a contract was made between the plaintiffs as first parties, and the defendants as second parties, the pertinent parts of which are as follows:

"THE SAID PARTIES OF THE FIRST PART are to furnish crushed lime stone to the second in at least the amount of 4000 net tons F. O. B. Faulkner, at $2.75 per net ton, for the wearing coat of the Elkins-Beverly project No. 78 Class A.Federal Aid Road, the said lime stone to be so crushed or manufactured to meet the requirements of the State specifications for bituminous macadam road.

"The said parties of the first part to begin shipment of said stone in the month of June, when the said second party gives notice so to do and to continue shipping said stone at the rate of one car load per day until the said 4000 tons are furnished.

"It is further understood that the said stone shall be shipped in drop bottom hoppers, but in case of shortage of cars, breakdowns, or other

> unavoidable accidents which may prevent the said
> first parties from shipping said stone as rapidly as
> heretofore agreed upon, the said first parties shall
> not be liable for damages to the said parties of the
> second part, but the said parties of the second part
> shall have the right to purchase said stone from
> elsewhere until the said first parties can resume
> shipment.''

In June defendant Dayton told plaintiff Bennett that he would not ''be ready to start at the specified time to use the stone'', and Bennett said ''it was perfectly satisfactory, that he wanted to make a general overhauling of the crusher''. Notice to begin shipments was not given until July 9, and shipments were not commenced until July 19, when two cars were shipped. Another car was shipped July 20. The defendants claimed that these three cars were ''out of the question for top surface use''. Bennett was sent for, and it was mutually agreed that defendants should take the stone at $1.75 a ton, and use it on the base. The plaintiffs re-adjusted their screens and commenced shipping again on August 1. During August and September they shipped defendants 32 cars. Bennett testified that the failure of plaintiffs to ship a car daily, (as provided by the contract), was unavoidable. Some of the stone shipped after August 1 was condemned by the road inspectors, and the defendants had to regrade, or clean, or otherwise prepare such stone before using it. Deductions were made at the time by defendants from the contract price for whatever such preparation cost. These adjustments were agreed to by plaintiffs.

On Oct. 5, the defendants wrote the plaintiffs as follows:

> ''Please stop shipment of all limestone, except
> two car loads of chips, to Elkins, as we need them
> at once. This is not due to bad stone, but to the
> fact that owing to the excessive freight rates and
> bad weather we are not using any more stone this
> year. We have a tank of tarvia here now and as
> soon as we get it on will close down for this fall.''

The plaintiffs shipped seven cars after receiving this letter. The two cars which contained the chips were accepted by

defendants. The other five cars were rejected. On Oct. 11, the defendants again wrote the plaintiffs: "We understand that you are still ordering cars shipped to Beverly, and this is to notify you that all stone will be refused except the two cars we agreed verbally to unload."

The plaintiffs say that all of the stone in the five cars which were rejected had already been prepared when they received the letter of Oct. 5, and that three of the cars were already loaded. Bennett also testified that it required the manufacture of the five cars rejected, to get the two cars of "chips." The plaintiffs testify that the five cars rejected, substantially met the State's specifications; the defendants testify that they did not. Defendants admit that they had not provided tarvia for any stone except what was on hand on Oct. 5.

The five rejected cars were finally sold by the railroad company. The amount realized was small, leaving $325.47 due on demurrage. This sum was paid by plaintiffs.

The defendants accepted and paid for 1910.55 tons. The five rejected cars contained 267 tons.

On March 30, 1922, the plaintiffs notified the defendants in writing that they were ready and willing, upon notice from defendants, to comply with the contract of May, 1921, in "every particular." The defendants made no reply and never ordered any more stone.

The only other contractors in that section who were operating in the spring of 1922, were Bramham and Yeater. These contractors had a road project, which commenced five miles from the railroad. In order to secure a contract with them, it was necessary for the plaintiffs to agree to deliver the stone. In making this delivery, the plaintiffs had to unload the stone from the railroad cars and haul it across country five miles. The unloading was done by means of a mechanical unloader. The price paid by Bramham and Yeater was $2.85 a ton, delivered. The plaintiffs expended 85c a ton to transport, and 10c a ton to unload this stone.

The plaintiffs demand in this suit 75c a ton damage on the stone not taken by defendants under the contract, $2.75 a ton for the five cars rejected, together with the demurrage

paid thereon, and $210.00 as rental on the unloader, used in unloading the stone sold to Bramham and Yeater. The defendants claim set-offs amounting to $17,885.00. Of this amount $203.00 is for ''cost of re-breaking—napping and harrowing, 29 car loads of stone not crushed in accordance with contract, at $7.00 per car.'' The balance of the offsets is for damages due to failure of plaintiffs to ship all of the stone in the summer of 1921 as provided by the contract.

The verdict of the jury indicates that small heed was paid to the defendants' offsets. The defendants had the right to reject any of the stone shipped which was not according to specifications. However, adjustments were made at the time for inferior quality, and the stone was used. The defendants cannot now justify their refusal to complete the contract, on the ground of poor quality. This defense is precluded by the letter of Oct. 5, stating that the suspension order was not due to bad stone but to excessive rates and bad weather. ''When refusal to accept goods purchased is based solely upon a particular objection, formally and deliberately stated, all other objections are deemed waived''. *Linger* v. *Wilson,* 73 W. Va.669. Damages for *unavoidable* failure to ship one car daily are expressly prohibited by the contract. The defendants offered no evidence in contradiction of Bennett's testimony that the delays were unavoidable.

The correctness of the verdict must therefore be tested by the evidence of the plaintiffs and the law applicable thereto.

Defendants seek to justify the ruling of the trial court in charges of error against plaintiffs' instruction No. 1, and the amount of the verdict. The motion before the trial court did not specifically complain of the instruction. But if plaintiffs' instruction was erroneous and affected the verdict, it may be considered under the charge of *contrary to law.* ''A verdict which is improperly affected by an error of law occurring at the trial, is a verdict contrary to law''. *Robinson Machine Works* v. *Chandler,* 56 Ind. 575 (583).

The instruction complained of is as follows:

> ''The court instructs the jury that if they believe from the evidence that the plaintiff and

defendant entered into the contract on the 17th day of May, 1921, for the furnishing of certain stone f. o. b. Faulkner at the price of $2.75 a net ton, and in pursuance of said contract the said plaintiffs had prepared and partially loaded three car loads of stone on October 7th, 1921, the date upon which the plaintiff received notice that the defendant desired shipment stopped on lime stone, and had two car loads of stone partly manufactured at said date and that in order to manufacture two car loads of chips required by the defendant it was necessary to complete the manufacturing of two cars of stone, then the plaintiff had a right to load and ship said five car loads of crushed lime stone to the defendant notwithstanding said attempt on the part of the defendants to stop shipment. And if you believe from the evidence that said five car loads of stone conformed to the specifications, then you should find a verdict for the plaintiff for the amount of said stone, together with all damages sustained by the plaintiff, including freight and demurrage by reason of defendants failure to accept said stone.''

This instruction contains two vices. It conforms neither to the facts proven nor to the law. Under the law the defendants had the absolute right to order the plaintiffs to stop shipments on stone—subject of course to the right of plaintiffs to be compensated in damages. *Electric Co.* v. *Coal Co.,* 91 W. Va. 347. That right is a legal right and cannot be defeated by the necessity of manufacturing other stone in order to get the two cars of chips. In the preparation of a ton of screened coal it is usually necessary to screen more than two tons of run-of-mine coal. But the claim is never advanced that the householder shall take the slack from the two tons in order to secure the ton of screened coal. Bennett testified that all of the five cars of stone were ''prepared'' at the time he received the suspension order of Oct. 5. If it was all *prepared* at that time, it is a contradiction to claim that the manufacture of two of the very same cars had to be completed to secure the chips.

As the verdict is for the plaintiffs, they are entitled to all the inferences fairly deducible from the evidence. Under the evidence it may be fairly inferred that three of the five cars rejected were loaded and already billed to defendants at the time the letter of Oct. 5, was received. Delivery to the railroad company was delivery to defendants. *Mullins* v. *Farris,* 100 W. Va. 540. Such delivery having been made prior to the suspension order, the defendants must pay for same and for the demurrage and freight thereon. The plaintiffs were not warranted in loading and shipping the other two cars after the positive order of defendants to ship no more stone. Williston on Sales par. 589. ''Where the buyer repudiates the contract and says he will not accept the goods proffered to be shipped to him, it is not the duty of the seller to go to the futile expense of shipping. It is the duty of the seller to minimize the damages, and if he should incur the expense of shipment, knowing it to be a vain and useless expenditure, he would be precluded under the law of damages from recovering therefor.'' *Shoe Co.* v. *Neely,* 99 W. Va. 657 (660.) Therefore the plaintiffs are not entitled to recover for the said two cars, or for the freight and demurrage thereon, and the instruction was wrong in authorizing such recovery.

The jury, however, did not allow the plaintiffs the full amount recoverable under that instruction. Plaintiffs contend that the value of the two cars and the demurrage thereon can be eliminated, and the evidence will still sustain the verdict. The defendants say the contrary, and their brief presents the following computation: ''The statement of stone delivered and accepted show 1910.55. Assuming that defendants are liable for three of the five rejected cars, at the contract price, the tonnage delivered is increased by 3/5 of 267, the tonnage of the five cars, 160.2 tons, making 2070.75 tons, and leaving a default as to the difference between 4000 tons and 2070.75 tons, 1929.25 tons, as to which the damage proved is 75 cents per ton, $1446.94. To this, add 3/5 of $325.47, freight and demurrage, $195.27, and the contract price of the 160.2 tons in three of the five rejected cars, the three that had been loaded when the countermand letter was received, $440.55.

This makes a total of $2,082.75, while the verdict was for $2,531.57.'' In a subsequent brief their counsel add to this sum three years interest thereon, (the case was not tried for three years after the breach of the contract), making a total recoverable under that theory of $2,456.00, which is still less than the verdict. We think the calculation in defendants' brief is approximately correct as far as it goes, but it does not include the ''unloader'' rental. Instead of embracing in one item the entire amount of damage for the stone sold below the contract price, the plaintiffs have awkwardly made two items; one of 75c and the other the rental charge for the unloader, at 10c a ton. Since Bramham and Yeater were the only parties in the spring of 1922 to whom plaintiffs could sell the stone, which the defendants should have taken, and it was necessary for the plaintiffs to unload the stone from the railroad cars and deliver it to Bramham and Yeater, in order to secure their order, then the plaintiffs had just as much right to charge the cost of unloading the stone against the price received from Bramham and Yeater, as they did to charge the cost of transportation. There is no evidence contradicting the plaintiffs that 10c a ton is a reasonable charge for unloading the stone, and that the cost of transportation was 85c a ton. Therefore under the evidence the stone sold to Bramham and Yeater netted the plaintiffs only $1.90 a ton, which was 85c below the contract price with defendants. To the sum computed at a loss of 75c a ton, must be added the loss of 10c more a ton. Ten cents a ton on the 1929.25 tons, even without the addition of three years interest, increases the amount the plaintiffs are entitled to recover under the evidence to more than one hundred dollars above the amount returned by the jury. It would therefore seem that the defendants suffered no prejudice from the erroneous instruction. If they were not injured by the instruction, the verdict should be sustained. Why retry the case when the plaintiffs have shown themselves entitled to recover an amount greater than the verdict? Why put the parties to the cost of continued litigation, when the ultimate outcome must be a verdict equal to or greater than the present one? No reason appears. ''A

verdict clearly supported by law and the evidence should not be disturbed because an erroneous instruction was before the jury." *Wiggin* v. *Dillon,* 66 W. Va. 313; Accord: *Reilly* v. *Nichols,* 72 W. Va. 189; *Belknap* v. *Rr. Co.,* 79 W. Va. 691.

The reasons advanced do not sustain the judgment of the trial court, and such judgment is therefore reversed, the verdict of the jury reinstated, and judgment for plaintiffs entered here.

*Judgment reversed; verdict reinstated, judgment entered here.*  ˙